IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GRAY HOLDCO, INC., )
    Plaintiff, )
 )
    v. )  2:09-cv-1519
 )
RANDY CASSADY and RWLS, LLC., )
    Defendants. )

Memorandum and Order

Mitchell, M.J.

The matter is before the Court for a hearing on the plaintiff's motion for a preliminary injunction (Docket No. 2). The parties have not consented to a consolidation of this matter for trial on the merits (F.R.Civ.P. 65(a)(2)). Hearing commenced on January 12, 2010, and upon consideration of the evidence presented we make the following:

FINDINGS OF FACT

1. The plaintiff in this action, Gray Holdco, Inc., ("Gray") is a Delaware Corporation with its principal place of business in the State of New York. Gray is a holding company which through its various holdings owns 100% of the stock of GWSI which provides cased-hole wireline services to the oil and gas industry. It has been acknowledged by the plaintiff that it engages in a highly open industry in which there are very few, if any, operational trade secrets and that all those involved in the field know who the providers are as well as who are the users

1

and equipment providers.

2. Defendant Randy Cassady ("Cassady") is a resident of Texas. He has a limited formal educational background and with the exception of short periods of time has been engaged in the wireline industry for over thirty years. He entered that industry as a laborer and worked his way up to the management level.

3. Defendant RWLS, LLC ("RWLS") is a limited liability Texas Company formed on or after October 6, 2009 with its principal place of business located in Levelland, Texas and maintains a facility in Mansfield, PA.

4. The cased-hole wireline industry is a small industry with three or four dominant providers and a number of small participants. There is a great amount of interaction between the workers for the various companies and frequent movement of workers and management occurs between the various participating firms. There is very little if any technical operational propriety information in the industry and most end users contract with several providers at the same time.

5. Contracts are not necessarily awarded to the lowest bidder because prior experience plays a part in these decisions.

6. The identity of potential customers is gained from a publically available service which secures the information from public filings. In addition, there is much communication within the industry.

7. In June, 2006 Cassady who had previously worked for a competitor of GWSI was hired by GWSI as District Manager at its Granbury, Texas facility and charged with the day to day operation of that facility. At that time Cassady did not receive an employment contract, either written or verbal, and his continued employment was entirely open-ended.

8. On December 4, 2006, six months after he commenced his employment, Cassady and GWSI completed the execution of a New Hire Plan Option to Purchase Stock ("the Plan") (PX-3) which granted him options to purchase 90 shares of Gray at $1850 per share over a five year period in return for his agreement to respect certain terms and conditions set forth in the restrictive covenants. Prior to receiving the agreement, he had no knowledge of the existence of a decision to offer stock options. He subsequently learned that GWSI had granted similar options for 2,688 shares and that none had been exercised. The latest independent consolidated financial statement for Gray demonstrates that these shares are essentially worthless due to the negative net worth of the company.

9. Section 19 of the Plan specifically provides that all rights created under the agreement are to be construed in accordance with the laws of the State of New York. In addition, the prefatory recitation in the agreement provides: "For value received and subject to the provisions hereinafter set forth..."

10. An essential element of the Plan is the provision in Section 12 that Cassady "agrees to be bound by the non-competition, non-solicitation, standstill, non-disparagement and/or confidentiality provisions as set forth [therein]..." (PX-3).

11. Other GWSI employees who were subjected to the same restrictions received large cash payments as a result of the 2006 merger-acquisition of GWSI by Gray, as well as fixed terms of employment with specified salaries, bonus opportunities and promises of generous severance packages from which they greatly profited. No such incentives or benefits were extended to Cassady in exchange for his execution of the agreement and indeed the quid pro quo

was entirely one-sides in favor of GWSI.

12.  Amongst the provisions of that agreement are that Cassady would not utilize proprietary information other than for advancing GWSI's purposes and that during the course of his employment and for a two year period following the termination thereof, Cassady would not directly or indirectly compete with GWSI anywhere or solicit its employees.

13. Thereafter, Cassady managed certain of plaintiff's other facilities and was appointed as Manager of the GWSI facility in New Kensington, Pennsylvania. In February 2009, Cassady was promoted to Region Manger and subsequently became Region Manager for plaintiff's Eastern Region charged with all operations for or out of the New Kensington facility as well as those in Lafayette, Louisiana . The market is a highly competitive one and one in which the employees move frequently between competing companies.

14. On September 20, 2009, Cassady resigned from plaintiff's employ (PX-6) in part due to its reneging on the representations made by GWSI that he would receive full reimbursement for his moving expenses, temporary housing expenses and any losses incurred on the sale of his house, and in part due to a fundamental change in the philosophy of GWSI. However, Cassady was aware that his termination of employment might create a conflict of interest.

15. During the course of his employment for GWSI, Cassady had access to its internal information concerning its financial performance and future business plans and strategies. Cassady also had access to confidential information concerning GWSI's customers, including the prices at which GWSI provided services to its customers, an amount that was determined by Cassady, as well as information regarding the customer's future business needs. He also had access to GWSI's personnel information. He did not acquire any additional technical expertise

4

during his employ with GWSI.

16. Following the termination of his employment, Cassidy and Matt Gray a newly resigned employee of GWSI formed Renegade ("RWLS") with Matt Gray as the majority owner and Cassady as the minority owner. RWLS is a direct competitor of GWSI.

17. During his employ with GWSI.. Matt Gray had not entered into a non-compete agreement for lack of consideration in exchange for the restrictive covenants. He suffered no ill consequences as a result of his failure to enter into that agreement demonstrating that the agreement was apparently of no significance to GWSI.

18.. Former customers of GWSI invited RWLS to submit bids for their projects and additionally RWLS also contacted GWSI customers about performing work for them. However, all this interaction occurred in a business environment that is totally open and in which there are few if any secrets.

19.  Cassady was advised that his former employer would probably commence legal action against him for a violation of his non-compete agreement. However, Cassady had already entered into extensive financial arrangements on behalf of himself and RWLS, and it was too late to discontinue the startup.

20. Matt Gray, whose father had started Gray,  and Cassady did not have a former relationship, but Matt Gray indicated that he could secure startup capital of approximately $1 million, relying on Cassady to provide the management and operational experience as well as utilizing his extensive industry contacts. The evidence demonstrates that even if Cassady is barred from working in the industry for a two year period, there is nothing to prevent the continued operation of RWLS under the leadership of Matt Gray or anyone else.

21. RWLS has already received over $800,000 in business from a client of GWSI.

22.  Cassady and Matt Gray solicited former employees of GWSI to join them, and RWLS now employs several former GWSI employees at slightly increased benefits and a promise of earning an equity interest. This resulted in GWSI having to transfer employees to perform its obligations, but did not cause an interruption of its Pennsylvania business which although now staffed with less experienced workers, is satisfactorily completing its work and maintaining an ongoing relationship with its customers although GWSI has not solicited additional work from some of its former customers.

23. Cassady acting on behalf of RWLS did contact suppliers of GWSI regarding pricing of equipment and supplies. He gained familiarity with these suppliers throughout the course of his extensive work in the industry and their existence was not a proprietary matter. This action in no way relies on information gained by Cassady during his employment at GWSI.

24. There was no proprietary information which the plaintiff obtained during the course of his employment with GWSI which is necessary for the operation of RWLS.

25. All operators in the cased-hole wireline industry are aware of who their competitors are; who the potential customers are and where to secure necessary material and equipment. That his, the closed-hole wireline industry is a totally transparent industry without any significant proprietary secrets.

26. As a result of his action, Cassady has not breached his argument with GWSI by engaging in direct competition with it since there was no consideration of any significance exchanged for his execution of the agreement; its scope is overly broad; there is no proprietary information in the industry, and Cassady took nothing from GWSI to RWLS with which to

commence operations.

CONCLUSIONS OF LAW

The matter is before the Court on the plaintiff's motion for a preliminary injunction.

1. The amount in controversy exceeds $75,000, and there is complete diversity amongst the parties to this action. For this reason, this Court's diversity jurisdiction is properly invoked pursuant to 28 U.S.C. 1332.

2. Venue is proper in this Court as a substantial portion of the events complained of occurred in this District.

3. As summarized in Snee v. Barone, 2009 WL 5103553 (C.A.3 (Pa.)) and as required by Rule 65, F.R.Civ.P.:

> A preliminary injunction is an "extraordinary remedy," ... In order to obtain a preliminary injunction, [a movant is] required to establish four elements: a likelihood of success on the merits, irreparable injury, a favorable balance of hardships, and consistency with the public interest ... Failure to establish any element renders a preliminary injunction inappropriate...(citing cases).

4. The agreement between the parties provides that any disputes be governed by the laws of the State of New York.

5. Under New York law, "absent a claim of fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny." Goldston v. Bandwidth Techn. Corp., 859 N.Y.S. 2d 651 (N.Y.App.Div.2008). Additionally, the value of that consideration is not crucial as long as it is acceptable to the parties. Goldreyer v. Van de Wetering, 630 N.Y.S. 2d 18 (N.Y.App.Div.1995). The only consideration which Cassady received as a result of executing

the agreement was the right to purchase 90 shares of Gray stock at $1850 per share, and this right is worthless. For this reason, the agreement borders on unconscionable in that it essentially bars Cassady from working in the industry for a two year period in exchange for nothing of value.

6. Restrictive covenants contained in employment contracts are disfavored as a matter of public policy in New York and will only be enforced through injunctive relief in limited circumstances. Ikon Office Solutions, Inc. v. Usherwood Office Technology, Inc. , 2008 N.Y. Slip Op. 52499, 2008 WL 5206291 (December 12, 2008). "Undoubtedly judicial disfavor of these covenants is provoked by powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." Reed, Roberts Association v Strauman, 40 NY2d 303, 307 (1976).

7. In the present case there is nothing to be gained by the plaintiff from enjoining Cassady other than barring him from being gainfully employed while at the same time the operations of RWLS could continue. That is, an injunction would reek of vindictiveness and not provide the plaintiff with any gain.

8. Specific performance of restrictive covenants will be granted only to protect against unfair competition. DO Seidman v Hirshberg, 93 NY2d 382, 391, 690 N.Y.S. 2d 854 (1999). Further, "a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee" Id. at 388-89.

9. As previously noted the covenant is geographically over-broad, it does not protect GWSI from any competition by RWLS, it is not protective of any public interest, and it would in essence

financially cripple Cassady.

10. We conclude as a matter of law, that the agreement entered into between Cassady and the plaintiff is not enforceable.

11. In the instant case, the plaintiff has not demontrated that it will likely succeed on the merits or will suffer any irreparable injury if Cassady is permitted to continue as a competitor; the hardship which would be suffered by GWSI is negligible when compared with the hardship which would be suffered by Cassady if an injunction were to issue, and there is clearly no benefit to the public from the issuance of equitable relief. We also note, that if in fact the plaintiff ultimately prevails on the merits, an award of monetary damages would provide adequate relief.

12. Thus we conclude as a matter of law that the plaintiff has failed to sustain its burden of demonstrating its entitlement to relief pursuant to Rule 65, F.R.Civ.P. and its motion for a preliminary injunction will be denied.

An appropriate Order will be entered.

ORDER

AND NOW, this 13th day of January, 2010, for the reasons set forth in the foregoing Memorandum, the plaintiff's motion for a preliminary injunction (Docket No. 2) is DENIED.

                                                    S/ Robert C. Mitchell
                                                    United States Magistrate Judge